IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| AURORA NATIONAL LIFE ASSURANCE COMPANY, <br><br>       Interpleader Plaintiff, <br><br> vs. <br><br> PATREKA HARRISON f/k/a PATREKA LUNSFORD f/k/a PATREKA EWING, GARY EWING, FL ASSIGNMENTS CORPORATION, and SINGER ASSET FINANCE COMPANY, <br><br>       Interpleader Defendants. | **No. 4:05-cv-00445-JEG-CFB** <br><br> **O R D E R** |
| PATREKA HARRISON f/k/a PATREKA LUNDSFORD f/k/a PATREKA EWING, <br><br>       Cross-Claim Plaintiff and <br>      Cross-Claim Defendant, <br><br> vs. <br><br> SINGER ASSET FINANCE COMPANY, <br><br>       Cross-Claim Defendant and <br>      Cross-Claim Plaintiff. | |

This matter comes before the Court on a Motion for Summary Judgment filed by Cross-Claim Plaintiff/Cross-Claim Defendant Patreka Harrison (Clerk's No. 46) and a Cross-Motion for Summary Judgment filed by Cross-Claim Defendant/Cross-Claim Plaintiff Singer Asset Finance Company (Clerk's No. 57). Also pending are Motions to Strike filed by Harrison (Clerk's No. 59) and Singer (Clerk's No. 49). Harrison is represented by Gail E. Boliver and Eric Bidwell, and Singer is represented by Mark D. Walz. Following an October 13, 2006, hearing, these matters are fully submitted and ready for disposition.

## MATERIAL FACTS[1]

Harrison is a resident of Amarillo, Texas.  Singer is a Delaware limited liability company with its principal place of business in Florida.

On October 15, 1985, while Harrison was a minor, Harrison's representative and the Security Bank of Nevada, through its Trust Department, acting as trustee and guardian of Harrison's estate, entered into a structured settlement agreement and release (the "Settlement Agreement") with Royal Insurance Company ("Royal Insurance") to settle a personal injury action brought in Nevada by Harrison's estate against William and Edith Price.[2]  The Prices were

---

[1] Complicating the Court's ability to untangle the factual history presented by this case has been the parties' disregard for Local Rule 56.1(b)(2), which requires a party resisting a motion for summary judgment to file "[a] response to the statement of material facts in which the resisting party expressly admits, denies, or qualifies each of the moving party's numbered statements of fact . . . ."  LR 56.1(b)(2) (2006).

Additionally, while each party has filed a motion to strike portions of affidavits submitted in support of the other's motion for summary judgment, many allegations in the challenged affidavits are either not relevant or can be drawn from undisputed portions of the record.  As the Court indicated at oral argument, the motions to strike shall be considered challenges to the weight afforded certain information as part of the summary judgment discussion, and not challenges to the propriety of including the facts alleged in the contested affidavits.  With this proviso, the parties' motions to strike are denied.

[2] If implemented properly, structured settlements have certain tax implications.  If a plaintiff receives a lump sum as a result of a settlement agreement, the plaintiff may exclude that payment from her taxable income.  However, any return from the plaintiff's investment on that sum is taxable as investment income.

Under a structured settlement agreement, the plaintiff receives periodic payments instead of a lump sum.  Each payment is considered "damages" received on account of personal injuries or sickness and is therefore excluded from the plaintiff's taxable income.  To reap these tax benefits, however, the recipient of the periodic payments must not have actual or constructive receipt of the economic benefit of those payments, so a structured settlement agreement may require the settling defendants to purchase an annuity contract from an insurance company to fund its obligations to make the payments.  Because the recipient is not in possession of the lump sum, the recipient need not include any investment return on the lump sum as taxable income.  This transaction gives the annuitant no right of ownership in the annuity, so if the defendant defaulted, the plaintiff could not seek redress from annuity's owner.  This created a problem for plaintiffs if the defendant was a high credit risk.

Congress added section 130 of the Internal Revenue Code in 1982, which created a tax-neutral transaction in which a settling defendant would assign and a third party would assume

insureds of Royal Insurance.  The Settlement Agreement was drafted and executed pursuant to an order entered by a Nevada state court.

The Settlement Agreement required the Prices, through Royal Insurance, to pay to the Security Bank of Nevada and eventually to Harrison an immediate lump sum of money as well as amounts disbursed periodically over several years (the "Periodic Payments").  The Periodic Payments were to be funded through the purchase of an annuity policy by Royal Insurance from Executive Life Insurance Company ("Executive Life").  Under the Settlement Agreement, Harrison would "have no rights of ownership in the annuity contract, no right to designate a beneficiary and no other right or control under the annuity contract whatsoever," but the Settlement Agreement did not restrict Harrison's right to assign the Periodic Payments.

The Settlement Agreement permitted Royal Insurance and the Prices to "assign their duties and obligations with respect to [the Periodic Payments] and the purchase of said annuity obligations to First Executive Corporation" ("First Executive").  Royal Insurance and the Prices made such an assignment.[3]  First Executive purchased an annuity policy (the "Annuity") from Executive Life to fund its obligation to make the Periodic Payments.  First Executive was later succeeded by FL Assignments.

Under the Settlement Agreement and the Annuity, Harrison was to be provided benefits in the following manner:

───────────────────

the obligation to make periodic payments under structured settlements.  If the third party had a high credit rating, such a transaction gave the plaintiff a benefit by permitting the plaintiff to rely on the third party's higher credit rating.  The conduct of the parties following the execution of the Settlement Agreement in this case indicates compliance with section 130:  Royal Insurance and the Prices assigned their obligations under the Settlement Agreement to First Executive, which became the payment obligor with respect to the Periodic Payments.  First Executive then purchased an annuity to fund that obligation from Executive Life.  Harrison has no right of ownership in the annuity purchased but, as discussed below, retains a right of ownership in the future payment stream created by the Settlement Agreement.

[3] The parties have not included the document memorializing this assignment.

- ▸ $1200 per month for a period of five years, with the first payment due November 16, 1985, and the final payment due October 16, 1990.

- ▸ $1200 per month for a period of five years, with the first payment due November 16, 1994, and the final payment due October 16, 1999.

- ▸ $2500 per month for sixteen years, with the first payment due November 16, 1999, and the final payment due October 16, 2015.  If Harrison lived beyond October 16, 2015, the annuity would pay $2500 per month on the 16th day of each month for the remainder of Harrison's life beginning on November 16, 2015.

- ▸ Lump sum payments:
  - ◦ $12,000 on November 16 in 1990, 1991, and 1992.
  - ◦ $37,000 on November 16, 1993.
  - ◦ $50,000 on November 16, 1998.
  - ◦ $75,000 on November 16, 2003.
  - ◦ $100,000 on November 16, 2008.
  - ◦ $125,000 on November 16, 2013.
  - ◦ $150,000 on November 16, 2018.
  - ◦ $200,000 on November 16, 2023.
  - ◦ $300,000 on November 16, 2028.
  - ◦ $400,000 on November 16, 2033.

Harrison App. 4-10, 272.

Following the conservation and liquidation of Executive Life, the Annuity was assumed by Aurora National Life Assurance Company ("Aurora"), a California company, in 1993 at 100 percent of its initial value (the "Restructured Annuity").  Aurora issued new terms governing the Restructured Annuity.  The terms of the Restructured Annuity describe and distinguish the roles of various parties to the contract:

> Owner.  The Owner of this contract as named in the Application or as changed by Written Request[4] thereafter while the Annuitant is alive . . . .
> Payee. . . .  The individual or entity to whom Benefit Payments are made under this contract . . . .

---

[4] "Written Request" is defined as:
Information given to the Company in writing in a form satisfactory to the Company and signed by the Owner prior to the death of the last surviving Annuitant or by the Beneficiary after the death of the last surviving Annuitant. . . .
Harrison App. 21.

> . . . .
> Assignment.  This contract may be assigned by Written Request by the
> Owner while any Annuitant was alive . . . .
> . . . .
> Owner.
> . . . .
>> e.  Change.  While the Annuitant is alive, the Owner may designate or
>> change the ownership by Written Request or a contingent Owner may be
>> designated or changed by Written Request. . . .

See Harrison App. 20, 25, 29-30.  Harrison was the Restructured Annuity's payee, and FL Assignments was its owner.  As the quoted terms show, the Restructured Annuity could not be assigned without a Written Request submitted by FL Assignments.  The record is devoid of such a request.

Beginning in 1997, Harrison sought to increase her income during a period of economic distress.  Through a series of four transactions executed over a sixteen-month period (collectively, the "Purchase Agreements"), Singer paid Harrison lump sums of money in exchange for Harrison's promise to transfer control over the Periodic Payments to Singer.  Each Purchase Agreement contains a clause indicating Harrison

> hereby sells, transfers, assigns, sets over and conveys to [Singer], or at
> [Singer]'s election, [Singer]'s assignee, all right, title and interest of
> [Harrison] in and to the "Assigned Assets", and, in reliance on the repre-
> sentations, warranties and covenants of [Harrison] contained herein and
> subject to the terms and conditions hereof, [Singer] hereby purchases and
> accepts the assignment of all right, title and interest of [Harrison] in and to
> the Assigned Assets, in consideration of the payment of the Purchase
> Price. . . .

Harrison App. 257, 349, 450, 551.[5]

---

[5] The "Assigned Assets" are the "Assigned Payments" assigned to Singer.  "Assigned Payments" are certain Periodic Payments or portions of Periodic Payments assigned to Singer through each Purchase Agreement.  See Harrison App. 268, 362, 463, 564.  The specific monies assigned are specified in a Terms Rider attached to each Purchase Agreement.  E.g., Harrison App. 268.

Singer also claims financing statements establish Harrison pledged as collateral her interest in future payments assigned to Singer through the Purchase Agreements to secure her obligations to Singer under the Purchase Agreements.

5

Through a "Notice of Direction of Payments" attached to the Purchase Agreements, Harrison directed First Executive or FL Assignments and Aurora to remit all Periodic Payments to a bank account in Harrison's name located in New York.  The Notice attached to the first two Purchase Agreements directs the Periodic Payments to be made by wire transfer and includes wiring instructions to access an account owned by Harrison.  The Notices do not indicate Harrison assigned or sold her right to receive payments under the Settlement Agreement, the Annuity, or the Restructured Annuity; instead, each Notice indicates Harrison was changing the address and bank account to which she wished the Periodic Payments to be sent.  The account was actually apparently controlled by Singer, which would deduct an amount equaling the payments assigned by the Purchase Agreements and refund the balance to Harrison.

Under section 5(d) of the Purchase Agreements, Harrison agreed not to make changes in the instructions set forth in the Notices of Direction of Payments after execution of the Purchase Agreements.  Section 5(f) of the Purchase Agreements required Harrison to "immediately deliver to [Singer] any checks, funds or other form of payment on account of or in connection with the Annuity or the Assigned Assets hereafter received by [Harrison] or anyone (other than [Singer]) claiming by or through [Harrison]."  Harrison App. 262, 354, 455, 556.

Harrison executed a document labeled "Absolute Assignment and Waiver of Claim" with each Purchase Agreement.  Through each waiver, Harrison "release[d] any rights, claims, interest, powers and privileges to any benefits or proceeds that [Harrison] might [have had] or in the future possess under the [Settlement Agreement], or in relation thereto, regarding the Assigned Assets."  Harrison App. 324, 426, 524, 624.  Singer claims the waiver, when read with other documents attached to each Purchase Agreement, secures Singer's right to receive all payments due to Harrison under the Settlement Agreement.

6

The four Purchase Agreements set forth the financial terms of each transaction.  Via a Purchase Agreement dated July 18, 1997, Harrison received an immediate payment of $44,033, and Singer received the right to

> 30 monthly payments of $150.00 commencing August 16, 1997 through and including January 16, 2000; 30 monthly payments of $500.00 commencing February 16, 2000 through and including July 16, 2002; [l]ump sum payment as follows: $50,000.00 due November 16, 1998.

Harrison App. 268.  Through this transaction, Harrison sold the right to receive nearly $69,500 in future payments for the immediate sum of $44,033.  A letter from Harrison dated June 28, 1997, indicates she understood she was "accepting the quote for $44,033 in exchange for [the] lump sum of $50,000 due on 11/16/1998 and monthly payments in the amount [of] $150 for 30 months, then increasing to $500 for an additional 30 months."  Singer App. 6.

Through a Purchase Agreement dated April 23, 1998, Harrison sold the right to receive a "[l]ump sum payment of $75,000 due November 16, 2000" for $25,734 payable immediately. Harrison App. 362.  And under a Purchase Agreement dated October 14, 1998, Harrison received an immediate payment of $47,023 but promised to give to Singer "120 monthly payments of $1,000.00 commencing November 16, 1999 through and including October 16, 2009; [and a] lump sum payment of $50,000.00 due November 16, 2008."  Harrison App. 463.  Thus, Harrison sold $170,000 in future payments for $47,023.

Finally, Harrison signed a Purchase Agreement on December 22, 1998, under which she received an immediate payment of $74,206, and Singer received

> One monthly payment of $1,000.00 due July 16, 2002[;] 197 monthly payments of $1,500.00 commencing August 16, 2002 through and including December 16, 2018[;] lump sum payments as follows:  $50,000.00 due November 16, 2008 and $125,000.00 due November 16, 2013.

Harrison App. 564.  As a result of this transaction, Harrison sold the right to receive $471,500 in future payments for the immediate sum of $74,206.

All Periodic Payments were directed to the New York account as directed by the Purchase Agreements from August 1997 through December 1999.  After deducting the Assigned Assets, Singer remitted the balance of the Periodic Payments to Harrison.  Singer argues this fact eliminates dispute regarding whether Harrison actually directed First Executive, FL Assignments, and Aurora to abide by the payment direction instructions submitted by Harrison as part of each Purchase Agreement, as well as whether Harrison's instructions were followed.[6]

In November 1999, Harrison noticed what she termed "discrepancies" in her payments.  Harrison expected to receive a payment of $2500 that month but received less.[7]  After consulting with a paralegal, Harrison contacted Aurora in a letter dated November 4, 1999, and requested future payments be deposited in her personal account at a bank in Iowa.  Her letter reflects that she "accept[ed] all responsibility to any actions that could be taken against [her] for" her request to have the payments redirected away from the New York account.

In December 1999 and January 2000, Aurora deposited monthly payments of $2500 in Harrison's Iowa bank account.  Singer claims this action violated the Purchase Agreements.

---

[6] In a letter dated September 12, 1997, Aurora acknowledged receipt of Harrison's request for a change in the direction in which she received payments.  Singer App. 17.  The acknowledgment indicated Aurora would seek approval of First Executive, the Restructured Annuity's owner.  Id.  No such approval is present in the record.  The record is also devoid of acknowledgments from Aurora, First Executive, or FL Assignments related to subsequent Purchase Agreements.

[7] Under the Restructured Annuity, Harrison was to receive monthly payments of $2500 beginning November 16, 1999.  However, Harrison purportedly assigned portions of those payments under the July 1997 and April 1998 Purchase Agreements.

A Singer representative informed Harrison she could not change the recipient of the payments. As a result, in January 2000, Harrison instructed Aurora to direct payments back to Singer. Singer began receiving $2500 payments from Aurora in February 2000. Harrison alleges that once Singer was reimbursed for any missed payments, Singer refused to pay Harrison her portion of the $2500 payments. She attempted to resolve the issue with Singer but claims she was told by a Singer representative that the company would not pay her "another dime."

According to Singer, Harrison diverted payments due December 16, 1999, onward and either changed or attempted to change the address to which those payments were sent such that Singer could not obtain monies to which it was entitled under the Purchase Agreements. As a result, Singer claims entitlement to the full amount of the Periodic Payments Harrison sold, in addition to interest, attorneys' fees, and other costs.

Singer points to section 5(f) of the Purchase Agreements as containing the remedies to which it is entitled. Under section 5(f), if

> any of the Assigned Assets is ever denied, diverted, set-off, delayed or withheld from [Singer] by virtue of any claim, demand, attachment, or other act or omission of [Harrison] or any person acting or claiming by, through, or under [Harrison], then [Harrison] hereby promises to pay within ten (10) days of demand, the entire amount of any such Assigned Asset, together with interest at the rate of eighteen percent (18%) per annum (or the maximum rate allowable by law whichever is lesser) from the date which such Assigned Asset should have been received by [Singer] to the date of actual payment.

Harrison App. 262-263; 354; 455; 556. Singer claims Harrison is required under the quoted acceleration clause to immediately pay the total amount assigned by the Purchase Agreements, missed payments, interest on any arrears, all remaining scheduled payments, and attorneys' fees and costs.

In a letter dated January 16, 2001, Kenneth R. Schild, Senior Vice President and General Counsel for Aurora, informed Singer's counsel that under the terms of the Restructured Annuity, only FL Assignments, then the annuity's owner, could "change direction of payments or assign

9

payments." Harrison App. 658.  Mr. Schild notes FL Assignments "specifically directed Aurora not to honor any redirection of payments or assignments unless there is authorization from the court that approved the settlement or direction by a court of competent jurisdiction has been directed to them." Harrison App. 658.  Aurora suspended making Periodic Payments entirely in February 2001.  Harrison App. 659-662 (letter from Aurora's counsel dated October 23, 2001, stating that "Aurora is currently holding (9) payments of $2500, for a total of $22,500.00, reflecting payments for the period February 2001 to and including October 2001").[8]

Harrison and her husband filed a voluntary petition in the United States Bankruptcy Court for the Southern District of Iowa (the "Bankruptcy Court") on September 10, 2001, and received a discharge from bankruptcy on December 27, 2001.  On December 2, 2002, Aurora initiated an adversary action in the Bankruptcy Court, joining as defendants Singer and Harrison, among others.  Aurora sought declaratory judgment in an effort to resolve to whom Aurora should remit the Periodic Payments.  Aurora sought and received permission to deposit payments into the registry of the Bankruptcy Court until the recipient of the Periodic Payments could be determined.

On June 20, 2005, Hon. Lee Jackwig, United States Bankruptcy Judge, granted the parities' Joint Motion for Entry of Consent Order for Transfer of Funds.  See In re Harrison, No.

---

[8] In February 2000, Singer initiated litigation in New York seeking to recover monies to which it claimed entitlement as a result of Harrison's breaches of the Purchase Agreements.  See Haigney Aff. ¶¶ 17-19, Feb. 24, 2004.  On October 31, 2001, Singer obtained a default judgment against Harrison in the amount of $846,931.64.  Id. ¶ 2, 20.  In December 2000, Singer filed an action against Harrison in California, seeking entry and enforcement of the New York judgment.  Compl. for Interpleader ¶ 23.  In January 2001, Harrison petitioned a California state court to vacate the New York judgment.  Haigney Aff. ¶ 20.  The California court declined.  Id.  In August 2001, Singer served on Aurora a Writ of Execution in the amount of $905,721.74, plus interest, and a Notice of Levy indicating $909,283.09, plus interest, which was required to satisfy the New York judgment.  Compl. for Interpleader ¶ 24.  On November 10, 2003, the New York judgment was vacated on appeal.  See Singer Asset Fin. Co. v. Ewing, No. 102108/00, slip op., at 1-2 (N.Y. Sup. Ct. Nov. 12, 2003); see also In re Harrison, No. 01-04681-rjh7, slip op., at 8-9 (Bankr. S.D. Iowa Aug. 16, 2004).  The parties have largely ignored these proceedings in their filings.

01-04681-rjh7, slip op., at 1 (Bankr. S.D. Iowa June 20, 2005).  Finding that the bankruptcy trustee had abandoned her claim to the Periodic Payments Aurora had deposited, Judge Jackwig ordered those funds to be released to Aurora and ordered Aurora to initiate an interpleader action in this Court to resolve "[a]ll issues related to the disbursement of the [suspended Periodic Payments], including requests for attorneys' fees and costs." Id. at 1-2.  Aurora complied on August 2, 2005, by filing a Complaint in this Court ushering the parties' dispute here. Aurora interpleaded Harrison, Singer, FL Assignments, and Gary Ewing.[9]  Harrison and Singer then filed cross-claims against each other.  Aurora was discharged by Order of this Court on April 20, 2006, see Aurora Nat'l Life Assurance Co. v. Harrison, No. 4:05-cv-00445, slip op., at 5-6 (S.D. Iowa Apr. 20, 2006), and has since deposited in this Court's registry past Periodic Payments and payments becoming due during this proceeding.  Those monies form the stake in the instant litigation.

In her cross-claim, Harrison has not set forth the legal basis under which she seeks relief. See Def. Harrison Ans. to Compl. for Interpleader & Cross-cl. (Clerk's No. 4); Def. Harrison Am. Ans. to Compl. for Interpleader & Cross-cl. (Clerk's No. 16).[10]  Her pleadings contain a declaration that she is in fact bringing a cross-claim, followed by an array of factual allegations and a claim to the stake.  See Def. Harrison Ans. to Compl. for Interpleader & Cross-cl., at 2-6. She does not separate her theories of recovery into counts, see Fed. R. Civ. P. 10(b), does not state the legal bases for her claim, see Fed. R. Civ. P. 8(a)(2), and does not state which of the four co-defendants her cross-claim is against.  The relief sought is an "order . . . awarding

---

[9] On December 14, 2005, the Clerk of Court entered orders of default against FL Assignments and Gary Ewing pursuant to Federal Rule of Civil Procedure 55(a).

[10] Harrison's "amended" pleading did not amend her original answer.  In her amended pleading, Harrison attached a bankruptcy court order relating to a motion for sanctions and added an affirmative defense.  No party has moved to strike this pleading.

[Harrison] payments, denying any debt to Singer, and ordering recommencement of the annuity payments directly to [Harrison].  Id. at 6.

Singer's cross-claims against Harrison number five.[11]  In Count I, Singer brings a breach of contract claim against Harrison.  In Counts II and III, Singer brings conversion and unjust enrichment claims, respectively, against Harrison.  In Count IV, Singer seeks an injunction requiring Harrison to comply with the Purchase Agreements; and in Count V, Singer seeks a declaratory judgment against Harrison and FL Assignments establishing that the Purchase Agreements are valid and enforceable.

At bottom, Singer seeks a judgment declaring its right to receive payments Harrison purportedly assigned to it, as well as funds necessary to recoup any arrears, contract interest, fees, and costs.  Singer claims these sums should be paid from those Periodic Payments which were not assigned to Singer.[12]  Singer also demands a declaratory judgment that the Purchase Agreements are valid and enforceable and that it holds a first, perfected security interest in payments assigned under the Purchase Agreements, as well as an order requiring Harrison to execute documents allowing Singer to enforce its rights to the collateral purportedly used to secure her performance under the Purchase Agreements.

Regarding the pending motions, Harrison does not specify whether she seeks summary judgment on her cross-claim or Singer's cross-claims.  Singer repeats the error in its resistance and in its own motion.[13]  However, because both parties address the validity and effect of the

---

[11] Pursuant to an April 5, 2006, order filed by Magistrate Judge Celeste F. Bremer, Singer amended its Answer and Cross-Claim Complaint.  Harrison has not filed an answer to Singer's amended pleading.

[12] As of October 1, 2006, Singer claims entitlement to a monetary judgment of $520,500.42, an amount which exceeds the total of all nonassigned Periodic Payments remaining to be paid to Harrison.  Barnett Aff. ¶¶ 16-17, Aug. 18, 2006.  These calculations are based on Singer's claim that it has not received payments due on or after July 16, 2000.  Id. at ¶ 10.

[13] Singer conceded at oral argument that resolving the pending motions would dispose of all of its claims against Harrison.

Purchase Agreements – and not, for example, whether Harrison committed the tort of conversion – the Court resolves that issue, alone.  Harrison seeks an order that the Purchase Agreements "are null and void" and that any Periodic Payments in this Court's registry be returned to her. Singer has combined its resistance to Harrison's motion and its own Motion for Summary Judgment into one document, but see LR 7.1(d) ("For every motion, the moving party must prepare a brief . . . ." (emphasis added)), so it is difficult to determine precisely what action Singer wishes the Court to take.  A fair reading of Singer's filings indicates it wishes the Court to declare the Purchase Agreements to be enforceable and to determine what amounts to which it is entitled.

## DISCUSSION

**I.     Standards for Summary Judgment.**

Federal Rule of Civil Procedure 56 permits cross-claim claimants and parties against whom cross-claims are brought to move for summary judgment.  Fed. R. Civ. P. 56(a), (b).  The standard is the same:  "[t]he judgment sought shall be rendered forthwith if the pleadings, depo-sitions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Id. R. 56(c).  A dispute about a fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also id. at 249 ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." (citing First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968)); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'")).

A genuine dispute about a fact is material if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. The materiality element is not met if the record contains disputes about facts which are "irrelevant or unnecessary. Id. And if the evidence supporting a claim or defense "is merely colorable or is not significantly probative, summary judgment may be granted." Id. at 249-50 (citing Cities Serv., 391 U.S. at 290; Dombrowski v. Eastland, 387 U.S. 82 (1967) (per curiam)); see also Matsushita Elec. Indus. Co., 475 U.S. at 586 (explaining that a nonmoving party "must do more than simply show that there is some meta-physical doubt as to the material facts"). Applicable substantive law governs which facts are critical and which are irrelevant. Anderson, 477 U.S. at 248; see also Nebraska v. Wyoming, 507 U.S. 584, 590 (1993) (when deciding if a material factual dispute exists, a court must "view[] the evidence through the prism of the controlling legal standard").

Procedurally, the moving party bears the burden of informing the court of the basis for its motion by pointing to places in the record demonstrating the absence of genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The resisting party must then go beyond the pleadings and present "'specific facts showing that there is a genuine issue for trial.'" Anderson, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)); see Celotex Corp., 477 U.S. at 324 (demanding a nonmoving party resist a properly supported motion "by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file" to "designate specific facts showing that there is a genuine issue for trial" (quotation marks omitted)). If a party bears the burden of proof at trial, summary judgment is appropriate against that party if it "fails to make a showing sufficient to establish the existence of an element essential to that party's case." Celotex Corp., 477 U.S. at 322; see also Nebraska v. Wyoming, 507 U.S. at 590; Lujan v. Nat'l Wildlife Found., 497 U.S. 871, 884 (1990). Under these circumstances, "[t]he moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element." Celotex Corp, 477 U.S. at 323; Lujan, 497 U.S. at 884.

14

Throughout this process, the Court must view the evidence and inferences from the record in a light favorable to the nonmoving party, see Anderson, 477 U.S. at 255, presume the nonmoving party's version of a disputed issue is the correct one, Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992); Arizona v. Maricopa County Med. Soc., 457 U.S. 332, 339 (1982), and steer clear of performing jury functions such as making "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts," Anderson, 477 U.S. at 255. If, at the conclusion of this process, "it is quite clear what the truth is," summary judgment may be granted, "for the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try.'" Poller v. Columbia Broad. Sys., Inc., 368 U.S. 464, 467 (1962) (quoting Sartor v. Ark. Natural Gas Corp., 321 U.S. 620, 627 (1944) (second omission by the Poller Court)).

Mindful of these standards, the Court turns to the parties' motions. Because many of the facts in this care are uncontested, analyzing the present dispute centers largely around the legal issue of which party is entitled to the stake. To the extent fact disputes exist, they are resolved favorably to Harrison in the following discussion.

## II.   Analysis.

### A.   Choice of Law Issues.

Because much of the following discussion revolves around issues of contract validity, it is key at the outset to identify which states' laws apply to which contracts. Iowa law governs choice of law decisions at this stage. See Whirlpool Corp. v. Ritter, 929 F.2d 1318, 1320-21 (8th Cir. 1991) (providing that forum state's choice of law rules apply in federal interpleader actions "because the federal interpleader action is merely a special brand of diversity jurisdiction" (dicta)); see also Republican Nat'l Comm. v. Taylor, 299 F.3d 887, 890 (D.C. Cir. 2002) (directing federal

courts to use choice of law rules of the forum state in statutory interpleader cases); Equitable Life

Assurance Soc'y of the U.S. v. McKay, 837 F.2d 904, 905 (9th Cir. 1988) (applying substantive

law of the forum state in statutory interpleader action); Reynolds v. American-Amicable Life Ins.

Co., 591 F.2d 343, 344 (5th Cir. 1979) (choice of law rules of forum state apply in an interpleader

action); James Talcott, Inc. v. Allahabad Bank, Ltd., 444 F.2d 451, 462 n.9 (5th Cir. 1971)

("Under the applicable conflicts of law principle in interpleader actions, a federal court applies the

choice of law rules of the state in which it is sitting."); Williams v. McFerrin, 242 F.2d 53, 55 (5th

Cir. 1958) (forum state's choice of law rules apply "since interpleader comes under the diversity

jurisdiction of the federal court").  Cf. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496

(1941) (holding that in diversity actions, federal courts apply conflict of law rules used by courts

in the state in which the district court is located); Griffin v. McCoach, 313 U.S. 498, 503 (1941)

(applying Klaxon in an interpleader action).

Because choice of law clauses express the intent of the parties to a contract, Iowa courts

are generally deferential to such clauses.  Gabe's Constr. Co. v. United Capitol Ins. Co., 539

N.W.2d 144, 146 (Iowa 1995); see Restatement (Second) of Conflict of Laws § 187(1) (1971)

("The law of the state chosen by the parties to govern their contractual rights and duties will be

applied if the particular issue is one which the parties could have resolved by an explicit pro-

vision in their agreement directed to that issue."); see also Cole v. State Auto. & Cas. Under-

writers, 296 N.W.2d 779, 781 (Iowa 1980) (citing Restatement (Second) of Conflict of Laws

§ 187).

The July 1997 and December 1998 Purchase Agreements state that they "shall be

governed, construed and enforced in accordance with the substantive laws of the State of New

York without regard to its choice of law rules."  Harrison App. 265; 559.  The April 1998 and

October 1998 Purchase Agreements contain similar provisions indicating Florida law applies.

Harrison App. 357; 458.  The Restructured Annuity contains a similar clause requiring

California law to control its interpretation.  Harrison App. 132.[14]  The Court concludes New

York law applies to the July 1997 and December 1998 Purchase Agreements, Florida law applies

to the April 1998 and October 1998 Purchase Agreements, and California law applies to the

Restructured Annuity.

The Settlement Agreement does not contain a choice of law provision.  Under Iowa

choice of law principles, if a contract lacks a choice of law clause, the law of the state which

"'has the most significant relationship to the transaction and the parties'" applies.  Gabe's

Constr. Co., 539 N.W.2d at 146 (quoting Restatement (Second) of Conflict of Laws § 188(1)

(1971)).  Factors considered include[15]

> (a)   the place of contracting,
> (b)   the place of negotiation of the contract,
> (c)   the place of performance,
> (d)   the location of the subject matter of the contract, and
> (e)   the domicile, residence, nationality, place of incorporation and place of
>        business of the parties.

---

[14] Because the Annuity has not been provided, the Court makes no determination regarding which state's law guides its interpretation.

[15] Section 188 of the Restatement (Second) Conflict of Laws directs the Court to a series of general principles set forth in section 6(2):
> (a)   the needs of the interstate and international systems,
> (b)  the relevant policies of the forum,
> (c)  the relevant policies of other interested states and the relative interests of
>        those states in the determination of the particular issue,
> (d)  the protection of justified expectations,
> (e)  the basic policies underlying the particular field of law,
> (f)   certainty, predictability and uniformity of result, and
> (g)  ease in the determination and application of the law to be applied.

Restatement (Second) Conflict of Laws § 6(2).  None of these principles are determinative here.

Restatement (Second) of Contracts § 188(2) (quoted in <u>Gabe's Constr. Co.</u>, 539 N.W.2d at 146; cited in <u>First Midwest Corp. v. Corporate Fin. Associates</u>, 663 N.W.2d 888, 893 (Iowa 2003); <u>Cole</u>, 296 N.W.2d at 781); <u>see also</u> <u>Joseph L. Willmotte & Co. v. Rosenman Bros.</u>, 258 N.W.2d 317, 327-28 (Iowa 1977).

Two of the three signatories to the Settlement Agreement executed it in Nevada.  The Settlement Agreement contains terms of settlement regarding a personal injury action then pending in Nevada.  The personal injury action was brought by the estate of a Nevada resident. Payments under the Settlement Agreement were to be made to a Nevada bank until Harrison reached the age of majority.  Balancing the factors quoted above requires the conclusion that Nevada law applies to the Settlement Agreement.

### B.   Summary of the Parties' Arguments.

At its core, Harrison's argument is twofold.  First, she claims that under the terms of the Restructured Annuity, only the annuity's owner could assign payments or change the address to which payments were made.  Harrison argues that because the Purchase Agreements required her to assign payments made under the Restructured Annuity or change the address to which such payments were made, the Purchase Agreements are invalid.  Second, Harrison argues the Court should not enforce the Purchase Agreements because they are violative of Iowa public policy.

Responding, Singer claims any anti-assignment language in the Restructured Annuity is not implicated because Harrison assigned rights generated by the Settlement Agreement.  It follows, Singer argues, that because the Settlement Agreement contains neither anti-assignment language nor any other language restricting Harrison's ability to sell or assign the right to receive payments thereunder, the Purchase Agreements memorialize valid transactions.  Singer also argues the Purchase Agreements are not in violation of public policy.

18

### C.   Validity of the Purchase Agreements.

Harrison first argues that the Settlement Agreement did not authorize her to designate an alternative payee for the annuity payments and gave her no right of ownership in the Annuity, meaning the Purchase Agreements are void.  She argues the Settlement Agreement deprived her of the right and power to assign payments.  Resolution of this issue distills to whether Harrison had assignable rights under either the Restructured Annuity or Settlement Agreement; and, assuming neither document barred such transactions, whether Nevada law – which governs the Settlement Agreement – poses an independent bar to transactions of this type.

### 1.   The Restructured Annuity.

The parties agree Harrison had no assignable rights under the Restructured Annuity because the right to assign or direct payments under the Restructured Annuity resided solely in the annuity's owner, which is not – and has never been – Harrison.  The record shows, however, that the Purchase Agreements did not only address those rights, if any, possessed by Harrison under the Annuity or Restructured Annuity.  Harrison assigned

> [a]ll right, title and interest of [Harrison], (and upon his [sic] death, all right, title and interest of his [sic] estate and of any beneficiary designate by him [sic]) to receive the Assigned Payments due to him [sic] (as defined in this Terms Rider) in, to and under <u>the Release,</u>[16] <u>the Annuity (or any funding asset substituted for the Annuity) the Qualified Assignment and any other documents executed in connection therewith or otherwise relating to the foregoing</u> and all right, title and interest of [Harrison,] his [sic] estate or any beneficiary thereunder, to receive any monies under or pursuant to such agreements, any monies actually received by [Harrison] pursuant to or by reason of any such agreements . . . and any interest on the proceeds of all of the above composing or comprising all or any portion of the Assigned Payments, and all of [Harrison]'s present or future right, title and interest to sell, assign, transfer, cause an early termination of, settle, receive consider- ation for, or undertake any similar activity with respect to any of the above.

---

[16] The "Release" is the Settlement Agreement.  <u>See</u> Harrison App. 279-290; 374-387; 475-488; 576-588.

Harrison App. 268 (emphasis added); accord Harrison App. 362, 463, 564.  The emphasized (and conjunctive) language makes clear Harrison assigned not only her right to payments under the Restructured Annuity – which she could not do – but also her right to payments under the Settlement Agreement.  As a result, the parties' dispute condenses to whether Harrison had assignable rights under the Settlement Agreement.

## 2. The Settlement Agreement.

Harrison claims generically that an annuitant lacking ownership rights in an annuity cannot effectuate the assignment of payments made under the annuity policy.  She argues that because neither First Executive nor FL Assignments approved the Purchase Agreements, they are not enforceable.  Harrison further argues that the Settlement Agreement barred her from assigning Periodic Payments.  She argues that because the Settlement Agreement restricted her from having any "right of ownership in the annuity contract, [any] right to designate a bene-ficiary and [any] other right or control under the annuity contract whatsoever," she could not assign payments she was eligible to receive under the Settlement Agreement.

Responding, Singer claims the Settlement Agreement does not prevent Harrison from assigning the right to receive Periodic Payments under the Settlement Agreement.  It points out that under the Settlement Agreement, Harrison could not transfer ownership of the annuity required to fund the Periodic Payments but was not similarly restricted with respect to the payments the Settlement Agreement itself required.  Singer contends that because it purchased the right to receive payments paid to Harrison under the Settlement Agreement, and not pay-ments made under the annuities themselves, Harrison assigned an assignable right.

A Third Circuit opinion authored by then-Judge Alito provides a useful analytical road-map to aid in untangling this situation.  See W. Union Life Assurance Co. v. Hayden, 64 F.3d

833 (3d Cir. 1995).  There, the subject of an adversary proceeding filed by debtors in a bank-ruptcy proceeding was a transaction in which one of the debtors, "in return for a cash payment, purported to assign . . . her right to receive certain future periodic payments."  <u>Hayden</u>, 64 F.3d at 834.  Much like the Periodic Payments, the payments were made pursuant to a settlement agreement.  <u>See</u> <u>id.</u> at 834-35.  The debtors contended the periodic payments belonged to the bankruptcy estate because the transaction was not an effective assignment.  <u>Id.</u> at 834.

After deciding the document signed by the debtor was an assignment and not a contract to make a future assignment – an issue not raised here – the court focused on whether the debtor had assignable rights under the annuity or the settlement agreement.  <u>Id.</u> at 838.  Focusing first on the annuity, the court held that the annuity's owner, as here, had exclusive power to change the payee and direct payments.  <u>Id.</u>  As a result, the debtor and assignee could not assign those payments.  <u>Id.</u>  With respect to the settlement agreement, the assignee argued that because the agreement "created a right to receive the periodic payments, [the debtor] could assign this right to receive the payments."  <u>Id.</u> at 838-39.  The debtor commented that "because the settlement agreement did not require more than the purchase of an annuity and because the annuity was purchased, [the debtor] did not have any remaining assignable rights under the agreement."  <u>Id.</u>

Finding ambiguity in the settlement agreement, the court turned to the "surrounding circumstances, the situation of the parties, and the objects they apparently have in view" to determine the parties' intent.  <u>Id.</u>  Arguing that the debtor intended to enter into a structured settlement in accordance with provisions of the Internal Revenue Code triggering certain tax advantages, <u>see</u> <u>supra</u> note 2, the assignee claimed the debtor was required to "retain a right to periodic payments under the settlement agreement," <u>Hayden</u>, 64 F.3d at 839.  The court agreed,

concluding that "[t]he annuity [was] merely a convenient funding mechanism," and did not alter

the obligor's "continuing obligation to pay the periodic payments to the recipient." Id. at 841.

The same situation exists here with one twist:  Royal Insurance and the Prices assigned

their obligation to make the Periodic Payments to First Executive, which was then succeeded by

FL Assignments.  Under Hayden, FL Assignments maintains a continuing obligation to pay

Harrison sums of money under the Settlement Agreement; the Restructured Annuity is merely a

convenient way to fund that obligation.  Harrison therefore possesses the right to receive pay-

ments required by the Settlement Agreement.

The Hayden court then considered whether the right to receive a stream of future pay-

ments was an assignable right.  Id. at 841.  One argument advanced mirrors that made here:

> [The debtors] contend that the settlement agreement must be read together
> with the annuity contract and that a provision of the annuity contract prevents
> the assignment of [the debtor]'s rights under both that contract and the
> settlement agreement.

Id. at 842.  Reading the annuity contract and the settlement agreement together, the court con-

cluded the debtor could assign the right to receive payments.  See id. at 842-43.  There, the

annuity contract contemplated restricting involuntary assignments in attempts "to protect the

payee from creditors by preventing them from attaching the annuity payments."  Id. at 843.

However, the court concluded that even if the annuity contract prohibited the payee from

voluntarily assigning the right to receive payments, that fact did not in turn imply that the debtor

could not assign the right to receive payments under the settlement agreement.  Id.  The court

held that the annuity's anti-assignment language "plainly state[d] that it applie[d] to the annuity

payments," and no evidence was submitted that the "clause was intended also to apply to pay-

ments made under the settlement agreement."  Id. (quotation marks omitted).  As a result, the

court rejected the argument that the debtor's right to receive payments under the settlement agreement was not assignable.  Id.

The case at bar is analogous.  Harrison claims her ability to assign the Periodic Payments is restricted by the Settlement Agreement.  However, the provisions identified by Harrison only prevent her from claiming ownership in the annuity, from designating a beneficiary under the annuity, or from controlling the annuity.  As in Hayden, this restriction was probably put in place to activate tax advantages available where an annuitant-payee lacks actual or constructive ownership of the annuity.  Harrison has not pointed to evidence suggesting any clause of the Settlement Agreement, Annuity, or Restructured Annuity impeding her right to control or assign the annuity delimitated her ability to assign the right to receive payments under the Settlement Agreement.  If the parties to the Settlement Agreement intended to prevent such transactions, they could have drafted language similar to that restricting Harrison's ability to control the annuity.

As a result, many of the cases cited by Harrison are not particularly persuasive.  E.g., Short v. Singer Asset Fin. Co., 107 F. App'x 738, 739 (9th Cir. 2004) ("find[ing] that the structured settlement's anti-assignment clause deprived [the recipient of payments] of not only the right to make the assignment . . ., but also the power to do so" because of "the plain language of the structured settlement's anti-assignment clause, which expressly curtail[ed the recipient's] 'power' to assign"); Liberty Life Assurance Co. of Boston v. Gilbert, No. 2:02-CV-341, 2006 WL 1211161, at *5 (E.D. Tenn. May 3, 2005) (concluding the recipient of payments under a settlement agreement lacked the power to assign payments where the agreement provided "that neither 'the Plaintiff [nor] any Payee shall have the power to sell, mortgage, encumber, or antici- pate Periodic Payments, or any part thereof, by assignment or otherwise'"); Singer Asset Fin.

Co. v. Bachus, 741 N.Y.S.2d 618, 619-21 (N.Y. App. Div. 2002) (where payments were "not subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge or encumbrance" and that "no part of the payments . . . [was] to be subject to execution or any legal process for any obligation in any manner, nor shall [the recipient] have the power to sell, mortgage, or encumber same, or any part thereof, nor anticipate the same, or any part thereof, by assignment or otherwise," the recipient could not enter into a loan agreement where a bank acquired the recipient's right to receive monthly annuity payments (quotation marks omitted; first alteration in the original)); see also In re Terry, 245 B.R. 422, 423-26 (Bankr. N.D. Ga. 2000) (holding an assignment was valid even where a settlement agreement contained anti-assignment language because the recipient ignored the language to assign certain payments, making an attempted revival of the anti-assignment clause to aid the recipient in funding a bankruptcy plan "disingenuous and not supported by applicable law").  Here, the Settlement Agreement is not equipped with language prohibiting Harrison from assigning her right to payments to which she was entitled to receive under the Settlement Agreement.

Two additional cases cited by Harrison require a more focused discussion.  In the first, the recipient of annuity payments executed an agreement wherein the recipient "agreed to execute, as sureties, [the recipient's friend]'s bail bond" in exchange for the recipient agreeing to "irrevocably assign . . . all of his right, title and interest to and in the . . . annuity contract and proceeds due thereunder" up to and including the amount of the bond.  Allstate Ins. Co. v. Am. Bankers Ins. Co. of Fla., 882 F.2d 856, 858 (4th Cir. 1989) (quotation marks omitted; second omission in the original).  The recipient's friend failed to appear, resulting in forfeiture of the bond.  Id. at 859.  Demand for reimbursement was then made upon the annuitant and the annuity's owner.  See id.  The annuitant initiated an action seeking rescission of the assignment,

arguing it was not a valid assignment.  Id.  Noting first that the recipient had no ownership rights in the annuity, the court held that the annuitant "could not lawfully assign" it.  Id.

The court next considered whether the annuitant could have assigned his "rights to receive . . . the annuity payments that were to become payable to him in the future . . .; [whether] those rights constituted an interest of his which was lawfully assignable; and [whether] the assignment operated to transfer those rights . . . ."  Id. at 860.  There, unlike here, the assignee asked the court to specifically enforce the purported assignment against the annuity owner and payment obligor.  Id.  The court held that specifically enforcing the assignment would be "inequitable and unjust specifically to enforce the assignment" because the party seeking specific enforcement executed the purported assignment after having been told by an agent of the annuity's owner that the annuitant's "interests therein were not assignable."  Id.

Allstate Insurance is distinguishable in at least two respects.  Most obviously, the recipient of the annuity payments there sought to assign the annuity itself.  Id. at 859-60.  That is not what Harrison did here; she also assigned her right to receive payments under the Settlement Agreement.  Second, the Allstate Insurance court endorsed the lower court's refusal to specifically enforce the attempted assignment because "equity would not decree specific performance of a contract that is founded in fraud, imposition, mistake, undue advantage, or gross misrepresentation, or where . . . it would be unconscientious to enforce it."  Id. at 860 (quotation marks omitted).  Harrison does not press those principles here.  Instead of relying on equitable principles to specifically enforce the Purchase Agreements, she argues the transactions embodied in the Purchase Agreements are barred by the Settlement Agreement.  The two situations are very different.

In the second case, <u>Grieve v. General American Life Insurance Co.</u>, a plaintiff and her mother entered into a structured settlement agreement with the insurance carrier of the operator of a bicycle upon which the plaintiff was riding when she was injured.   <u>Grieve v. Gen. Am. Life Ins. Co.</u>, 58 F. Supp. 2d 319, 320 (D. Vt. 1999).   The plaintiff was a minor when she was injured but had reached majority age when the structured settlement agreement was executed.   <u>Id.</u> at 319-20.   The settlement agreement specifically provided that periodic payments made thereunder could not "be accelerated, deferred, increased or decreased by [the plaintiff] or any Payee; nor [could the plaintiff] or any Payee have the power to sell, mortgage, encumber, or anticipate the periodic payments, or any part thereof, by assignment or otherwise."   <u>Id.</u> at 321 (quotation marks omitted).   The insurance company made a qualified assignment of its obligation to make payments under the settlement agreement.   <u>Id.</u>   The new obligor funded the payments through the purchase of an annuity policy.   <u>Id.</u>

The qualified assignment contained the proviso that no periodic payments could be "accelerated, deferred, increased or decreased, nor [could any payments be] anticipated, sold, assigned or encumbered."   <u>Id.</u> (quotation marks omitted).   The annuity policy established that the plaintiff did not own the annuity, had no ownership rights under the contract, and could not "assign or otherwise use it as collateral."   <u>Id.</u>   The policy further provided that "[n]o amounts payable under [the] contract to a payee other than [the contract owner] may be assigned by that payee."   <u>Id.</u> (first and third alterations in the original; quotation marks omitted).

Several years later, the plaintiff's financial situation worsened.   <u>Id.</u>   She contemplated entering into purchase agreements similar to those here with Singer Asset Financial Company – the same entity involved in this case – wherein she agreed to "give up" some future payments for an immediate lump sum.   <u>Id.</u>   The plaintiff requested that the address to which payments were

sent be changed to a New York post office box.  Id.  As a condition of the address change, the

plaintiff was asked to execute an affidavit stating that she was not assigning any rights under the

annuity.  Id.  Instead of executing the affidavit, the plaintiff filed a complaint for declaratory

relief, demanding that the annuity's owner and issuer honor her assignment to Singer.  Id.

The purchase agreements were never finalized.  Id.  After initiating her lawsuit, the

plaintiff and Singer entered into a "loan agreement" where the plaintiff received a sum from a

bank through a loan which would be assigned to Singer.  Id.  In exchange, Singer received a

series of future payments.  Id.

The annuity owner and issuer claimed the settlement agreement, qualified assignment,

and annuity policy all prohibited the plaintiff from selling or assigning her right to payments

under the settlement agreement, that such assignments were barred by law, and that public policy

rejected the sale or assignment of periodic payments from structured settlement agreements.  Id.

at 322.  The plaintiff claimed any restrictions on the sale or assignment of the periodic payments

were non-enforceable.  Id.

The court first concluded that the "prohibitions of assignment [were] valid, enforceable

terms," primarily in reliance on Vermont's version of Article 9 of the Uniform Commercial

Code.  See id. at 323-24.  Harrison has elected not to present an argument based on the details of

Article 9.  Instead, Harrison points to the Grieve court's alternative holding:  that the sale of

proceeds of structured settlement agreements on the record before it violated public policy.  Id.

at 324.  The court wrote,

> [The plaintiff] is currently in substantial financial need.  The Court is asked
> to enforce a transaction which will place her in significantly greater financial
> need, by cutting her income stream in half for the next fifteen years.  [The
> plaintiff], like any other citizen is free to make agreements which this Court
> might deem unwise.  But this Court will not lend its approval to the voiding

> of unambiguous, bargained-for contract terms in order to enable Singer to
> profit, at an exorbitant rate of interest, from [the plaintiff]'s financial distress.

Id.  Unfortunately for Harrison, the two pillars of the court's analysis – a high interest rate resulting from a secondary loan agreement and multiple instances of clear anti-assignment language – are absent here.  Grieve is therefore distinguishable and the policy argument less compelling.

The parties have identified nothing in the Settlement Agreement or Restructured Annuity preventing Harrison from assigning her right to receive payments under the Settlement Agreement.  The Court must conclude the Purchase Agreements memorialized transactions not barred by the Settlement Agreement.

### 3. Nevada Law.

Because the Settlement Agreement itself did not prevent Harrison from assigning her right to receive Periodic Payments, the next issue is whether Nevada law otherwise restricted her from taking that action.  Nevada law applies because the assignable right – entitlement to the Periodic Payments – was created by a contract governed by Nevada law.  The Court invited Harrison to present at oral argument any provision in Nevada law restricting her freedom to assign portions of the Settlement Agreement.  She identified none.  Singer, however, cites one case, Wood v. Chicago Title Agency of Las Vegas, Inc., 847 P.2d 738 (Nev. 1993), for the proposition that a payee in Harrison's position may assign the right to receive money due under a settlement agreement under Nevada law.

Wood has little in common with the case at bar.  There, Chicago Title Agency of Las Vegas, Inc., held money in escrow which was the subject of litigation between Robert Chapman and Dasco, Inc.  Wood, 847 P.2d at 739.  Chapman executed a promissory note to Warren

Wood, which was payable on or before settlement of Chapman's litigation with Dasco.  Id.

Chapman then assigned his interest in the escrow account to Wood.  Id.  Wood notified Chicago

Title of the assignment.  Id.  A court order following a stipulated settlement agreement between

Chapman and Dasco authorized Chicago Title to release a portion of the funds held in escrow to

Chapman.  Id.  The order also further directed Chapman to pay assignments or liens filed as a

result his litigation with Dasco.  Id.  Chapman's attorney presented Chicago Title with a copy of

the order, but Chicago Title did not pay Wood as directed by Chapman's assignment.  Id.  Wood

subsequently filed a lawsuit against Chicago Title; Chicago Title filed a third-party complaint

against Chapman for indemnification.  Id.  At issue was whether the order following the stipu-

lated settlement excused Chicago Title – the obligor – from honoring the contractual obligation

in favor of the assignee – Wood – where neither Wood nor Chicago Title was before the court

entering the order.  Id.

    The issue here is entirely different.  In Wood, the parties did not contest whether the

assignee could assign the portion of the account to which he was entitled.  The issue was whether

the obligor was excused of its obligation to render payment to the assignee under the circum-

stances of that case.

    The parties have identified no provision under Nevada law which would bar the trans-

actions embodied in the Settlement Agreements.  As a result, the Court concludes Nevada law

poses no independent barrier to Singer's enforcement of the provisions they contain.

### 4.    Conclusion.

    Harrison's claim that the Settlement Agreement and Restructured Annuity prevented her

from assigning the Periodic Payments fails.  And because the Purchase Agreements effected

transactions not prevented by the Settlement Agreement, the Restructured Annuity, or Nevada

law, each basis – excepting public policy considerations – upon which Harrison's cross-claim rests must also fail.  The Court is compelled to conclude the Purchase Agreements are valid, enforceable contracts not voided or otherwise invalidated by the Settlement Agreement, the Restructured Annuity, or Nevada law.

### D.  Public Policy Considerations.

Harrison alternatively argues that the Court should rescind the Purchase Agreements because their enforcement would "violate the intent of the Settlement Agreement and ignore the doctrine of equity."  Harrison claims "public policy favors the prohibition of assigning structured settlement payments, as opposed to the factoring of such payments, which strips structured settlements of their very purpose."  The parties agree that Iowa law applies to this issue.

Other than repeating that the Purchase Agreements should be invalidated as against public policy, Harrison does not identify a legal reason for rescinding the Purchase Agreements. As a result, the Court concludes Harrison seeks to have the Purchase Agreements declared unenforceable on public policy grounds and does not seek rescission.[17]  In her Reply, Harrison

---

[17] The equitable remedy of rescission, or "the unmaking of a contract," Dailey v. Holiday Distrib. Corp., 151 N.W.2d 477, 482 (Iowa 1967), is a remedy "for failure of consideration, fraud in making the contract, for inability to perform it after it is made, for repudiation of the contract or an essential part thereof, and for such a breach as substantially defeats its purpose.'" Maytag Co. v. Alward, 112 N.W.2d 654, 660 (Iowa 1962) (quotation marks omitted).  "Three requirements must be met before rescission will be granted: (1) the injured party must not be in default, (2) the breach must be substantial and go to the heart of the contract, and (3) remedies at law must be inadequate."  Clark v. McDaniel, 546 N.W.2d 590, 595 (Iowa 1996) (citing Potter v. Oster, 426 N.W.2d 148, 151 (Iowa 1996)).  The breach of the party against whom rescission is sought must be "so substantial as to defeat the object of the contracting parties."  Beckman v. Carson, 372 N.W.2d 203, 208 (Iowa 1985); accord Nora Springs Co-op. Co. v. Brandau, 247 N.W.2d 744, 749 (Iowa 1976); Alward, 112 N.W.2d at 660; see also White v. Massee, 211 N.W. 839, 841 (Iowa 1927) ("Rescission or cancellation will not be granted for a mere breach not so substantial or fundamental as to defeat the object of the parties in making the agreement." (collecting authorities)).

Focusing on the first element, if the party claiming rescission is herself in default, rescission is not an available remedy.  See Shell Oil Co. v. Kelinson, 158 N.W.2d 724, 730

identifies the Iowa Structured Settlement Agreement Protection Act, Iowa Code ch. 682 (2006),

as indicative of a public policy against the assignment of proceeds of structured settlements.  As

a result, Harrison argues, the Court should invalidate the Purchase Agreements.

Applicable to transfers of structured settlement payment rights occurring on or after July

31, 2001, id. § 682.7(4), the Iowa Structured Settlement Protection Act wove procedural and

substantive safety nets applicable to those wishing to assign or sell rights created by structured

settlement agreements.  The Act reads, in relevant part,

> 1.  A transfer of structured settlement payment rights shall not be effective
> and a structured settlement obligor or annuity issuer shall not be
> required to make any payment directly or indirectly to a transferee of
> structured settlement payment rights unless the transfer has been
> approved in advance in a final court order or order of a responsible
> administrative authority based on express findings by such court or
> responsible administrative authority regarding all of the following:
>   a.  The transfer is in the best interest of the payee, taking into account
>       the welfare and support of the payee's dependents.
>   b.  The payee has been advised in writing by the transferee to seek
>       independent professional advice regarding the transfer and has
>       either received such advice or knowingly waived such advice
>       in writing.

---

(Iowa 1968);  Binkholder v. Carpenter, 152 N.W.2d 593, 600 (Iowa 1967); Alward, 112 N.W.2d at 660.  Singer alleges Harrison defaulted by changing the address to which payments were sent and by failing to remit to Singer payments she received, each in violation of sections 5(d) and 5(f) of the Purchase Agreements.  The record contains fact questions regarding whether Harrison engaged in this conduct.  As a result, the record is not free of doubt regarding whether Harrison breached the Purchase Agreements.  Further, with respect to the second element, Harrison has not pled Singer breached the Purchase Agreements in a substantial way going to the heart of the agreements.  See Def. Harrison Ans. to Compl. for Interpleader & Cross-cl. 2-6, at ¶¶ 1-26.

Finally, Harrison's reliance on Short v. Singer Asset Finance Co., 107 F. App'x 738 (9th Cir. 2004) (2-1 decision), is unavailing.  Analyzing a transaction similar to that presented in this case, a majority of a Ninth Circuit panel held that an attempted assignment was "null and void" because the settlement agreement contained anti-assignment which expressly curtailed the "power" to assign payments received thereunder.  Id. at 738.  Because no agreement to assign existed, the proper remedy was to "in effect, rescind the contract" assigning the right to receive payments under the settlement agreement.  Id. at 740.  Here, the Settlement Agreement contained no anti-assignment language.  To the extent Harrison seeks rescission of the Purchase Agreements, her Motion for Summary Judgment is denied.

   c. The transfer does not contravene any applicable statute or the order
    of any court or other government authority.

Id. § 682.4(1).  If the Purchase Agreements were executed today, approval by a "court or

responsible administrative authority" would be required before the transfer envisioned by the

Purchase Agreements would become effective.  See id.  While Harrison concedes this Act "does

not apply to [her] case," she argues that "its eventual enactment must be recognized by this

Court as indicative of Iowa public policy."  As a result, Harrison argues, the Purchase Agree-

ments should not be enforced.

### 1. Applicable Legal Principles.

  Under Iowa law, a contract contravening public policy will not be enforced.  Walker v.

Gribble, 689 N.W.2d 104, 110 (Iowa 2004) (collecting cases); Rogers v. Webb, 558 N.W.2d

155, 156-57 (Iowa 1997) (collecting cases); Walker v. Am. Family Mut. Ins. Co., 340 N.W.2d

599, 601 (Iowa 1983); Wunschel Law Firm, P.C. v. Clabaugh, 291 N.W.2d 331, 335 (Iowa

1980) (collecting cases); Rowen v. Le Mars Mut. Ins. Co. of Iowa, 282 N.W.2d 639, 650 (Iowa

1979) (collecting cases); see Harvey v. Care Initiatives, Inc., 634 N.W.2d 681, 684 & n.4 (Iowa

2001) (concluding that the tort of discharge in violation of public policy did not extend to protect

independent contractors who have available to them contract remedies unavailable to at-will

employees including, inter alia, the ability to void a contract if it is in violation of public policy).

If a contract "'tends to be injurious to the public or contrary to the public good,'" it ought not be

enforced.  Walker v. Gribble, 689 N.W.2d at 111 (quoting Rogers, 558 N.W.2d at 157).

  Exercising caution before excising terms from a contract on public policy grounds is

required because courts must balance the identified public policy against a strong policy in favor

of parties' freedom to contract.  This is a patently high standard.  "Before striking down a

contract for public policy reasons, it must be shown that the preservation of the general public

welfare outweighs the weighty societal interest in the freedom of contract."  Walker v. Gribble,

689 N.W.2d at 111; accord Grinnell Mut. Reinsurance Co. v. Jungling, 654 N.W.2d 530, 540

(Iowa 2002); Shelter Gen. Ins. Co. v. Lincoln, 590 N.W.2d 726, 730 (Iowa 1990); Rogers, 558

N.W.2d at 157; Walker v. Am. Family Mut. Ins. Co., 340 N.W.2d at 601; see also DeVetter v.

Principal Mut. Life Ins. Co., 516 N.W.2d 792, 794 (Iowa 1994) (Only if "the preservation of the

general public welfare imperatively so demands invalidation so as to outweigh the weighty

societal interest in the freedom of contract" may a court invalidate a contract on public policy

grounds.).  The balance must be so one-sided that the "power to invalidate a contract on public

policy grounds must be used . . . only in cases free from doubt."  DeVetter, 516 N.W.2d at 794

(citing Walker v. Am. Family Mut. Ins. Co., 340 N.W.2d at 601); accord Grinnell Mut.

Reinsurance Co., 654 N.W.2d at 540; Shelter Gen. Ins. Co., 590 N.W.2d at 730; Rogers, 558

N.W.2d at 157; Wunschel Law Firm, P.C., 291 N.W.2d at 335.  In more anthropomorphic terms,

"'[t]here is a certain danger in too freely invalidating private contracts on the basis of public

policy. . . .  [F]or a court to undertake to invalidate private contracts upon the ground of 'public

policy' is to mount a very unruly horse, and when you once get astride it, you never know where

it will carry you.'"  Jungling, 654 N.W.2d at 540 (quoting Skyline Harvestore Sys., Inc. v.

Centennial Ins. Co., 331 N.W.2d 106, 109 (Iowa 1983)) (quotation marks omitted).

     While the term "public policy" is not easily defined, the thrust of the term "is quite clear:

'a court ought not enforce a contract which tends to be injurious to the public or contrary to the

public good.'"  Rogers, 558 N.W.2d at 157 (quoting Walker v. Am. Family Mut. Ins. Co., 340

N.W.2d at 601).  Legislative pronouncements and judicial decisions can be reliable sources of

public policy.  See, e.g., Walker v. Am. Family Mut. Ins. Co., 340 N.W.2d at 601-03; see also

Restatement (Second) of Contracts § 178(1) (1981) ("A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable[18] or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms." (quoted in Mincks Agri Ctr., Inc. v. Bell Farms, Inc., 611 N.W.2d 270, 275 (Iowa 2000); cited in Rogers, 558 N.W.2d at 157)).  Proof that the contract caused a "feared evil" is unnecessary; a tendency to have the feared result is enough.  Rogers, 558 N.W.2d at 157 (discussing Wunschel Law Firm, P.C., 291 N.W.2d at 335).

##### 2.   Analysis.

A series of Iowa cases stands for the proposition that a contract should be invalidated on public policy grounds if it violates a regulatory statute in existence at the time the contract was made.  E.g., Bergantzel v. Mlynarik, 619 N.W.2d 309, 311-18 (Iowa 2000) (contingency contract directing negotiation of a settlement agreement constituted the unauthorized practice of law, making the contract unenforceable on public policy grounds); Mincks Agri Ctr., Inc., 611 N.W.2d at 275-81 (statute requiring persons to obtain a license before engaging in business as a grain dealer weighed in favor of invalidating contract at issue); Smith Fertilizer & Grain Co. v. Wales, 450 N.W.2d 814, 815 (Iowa 1990) ("[C]ontracts in violation of regulatory statutes may be unenforceable under general contract law." (dicta)); Moravek v. Davenport Cmty. Sch. Dist., 262 N.W.2d 797, 803-05 (Iowa 1978) (grievance procedure term in contract violative of state

---

[18] There is no legislative pronouncement that contracts like the Purchase Agreements are either illegal or automatically unenforceable.  See Restatement (Second) of Contracts § 178 cmt. a ("Occasionally, on grounds of public policy, legislation provides that specified kinds of promises or other terms are unenforceable.  Whether such legislation is valid and applicable to the particular term in dispute is beyond the scope of this Restatement.  Assuming that it is, the court is bound to carry out the legislative mandate with respect to the enforceability of the term.").  Instead, under the Iowa Structured Settlement Protection Act, parties must simply comply with certain procedural steps before entering into such contracts.

statute and therefore unenforceable on public policy grounds).  Here, of course, the Iowa Structured Settlement Protection Act did not come into being until after the execution of the last Purchase Agreement.

Harrison relies on <u>Liberty Life Assurance Co. of Boston v. Gilbert</u>, to support her argument that public policy prohibits enforcement of the Purchase Agreements.  As noted above, in <u>Gilbert</u>, the settlement agreement and release deprived the payee of "the power to sell, mortgage, encumber, or anticipate the Periodic Payments, or any part thereof, by assignment or otherwise." <u>Gilbert</u>, 2006 WL 1211161, at *5 (quotation marks omitted).  In <u>dicta</u>, the court wrote that "[e]ven if the settlement agreement and/or release did not contain the language prohibiting [the recipient] from assigning his rights to receive payment, it is clear under [applicable law], that these types of transactions are not favored." <u>Id.</u>  The court noted that shortly after the transaction attempting to transfer payments occurred, "the Virginia legislature codified the public policy disfavoring such transactions, enacting the Structured Settlement Protection Act which require[d] the 'direct or indirect transfer of structure[d] settlement payments' to be approved in advance by a court or responsible administrative authority."  <u>Id.</u> (quoting Va. Code Ann. § 59.1-476 (2005)).  Even though the act did not apply to the transaction analyzed in the case before it, the court found its enactment "clearly indicative of Virginia public policy" in support of invalidating such transactions.  <u>Id.</u> at *5-*6.  Like the Virginia statute in <u>Gilbert</u>, the Iowa Structured Settlement Protection Act expresses a clear public policy against the unapproved transfer of structured settlement payments where a transfer would wreak economic hardship upon the settlement agreement's payee.

Assuming the Purchase Agreements violate a public policy codified after the culmination of the transaction does not end the analysis.  As noted above, the outcome of a balancing test

determines whether a strong policy in favor of protecting private parties' freedom to contract is

outweighed by the identified public policy.  The Supreme Court of Iowa has endorsed the factors

set forth in section 178 of the Restatement (Second) of Contracts to balance "the competing

interests implicated in the enforcement of a contract that violates public policy."  Bergantzel,

619 N.W.2d at 317; see also Walker v. Gribble, 689 N.W.2d at 111 (citing Restatement (Second)

of Contracts § 178(2)-(3) as "setting forth factors for and against enforcement"); Mincks Agri

Ctr., Inc., 611 N.W.2d at 275 (providing that section 178 gives "helpful guidance in determining

whether the interest in enforcing the contract is outweighed by the public policy at stake").

Section 178 reads, in relevant part, as follows:

> (2)  In weighing the interest in the enforcement of a term, account is taken of
>     (a)  the parties' justified expectations,
>     (b)  any forfeiture that would result if enforcement were denied, and
>     (c)  any special public interest in the enforcement of the particular term.
> (3)  In weighing a public policy against enforcement of a term, account is
>     taken of
>     (a)  the strength of that policy as manifested by legislation or
>          judicial decisions,
>     (b)  the likelihood that a refusal to enforce the term will further
>          that policy,
>     (c)  the seriousness of any misconduct involved and the extent to which
>          it was deliberate, and
>     (d)  the directness of the connection between that misconduct and
>          the term.

Restatement (Second) of Contracts § 178(2)-(3); see Bergantzel, 619 N.W.2d at 317 (quoting

Restatement (Second) of Contracts § 178; Mincks Agri Ctr., Inc., 611 N.W.2d at 275 (quoting

same); Wunschel Law Firm, P.C., 291 N.W.2d at 335 (citing draft version of section 178).

The analysis begins with the trio of factors weighing in favor of enforcing the Purchase

Agreements.  Although Harrison relates she was confused regarding the terms of the Purchase

Agreements, the record shows she directed Aurora, First Executive, and FL Assignments to

change the payment address to which payments were sent.  The record is replete with notes and letters authored by Harrison requesting FL Assignment and First Executive to take action consistent with the Purchase Agreements.  Still another writing indicates she understood the transaction resulted in the sale of some Periodic Payments to Singer.  See Harrison App. 722 ("About a year ago I sold parts of my settlement to Singer Asset Finance via US Trust.").  The record reflects Harrison understood the implications the Purchase Agreements would have on her income under the Settlement Agreement and reveals she understood she was transferring ownership of portions of the payment stream created by the Settlement Agreement.  Additionally, the record shows that after Harrison ordered that payments be directed to an account controlled by Singer, the payments were so directed for a lengthy period of time.  Consequently, the Court concludes the intent of the parties as memorialized in the Purchase Agreements was to complete a transaction whereby Harrison would assign the right to receive future payments under the Settlement Agreement for immediate lump sum payments.  The parties' conduct following those transactions is consistent with the terms of those agreements.

Second, the forfeiture imposed on Singer if the Court decided the Purchase Agreements were unenforceable would be substantial.  There is no dispute that Singer paid to Harrison significant sums of money in exchange for the right to receive portions of an ongoing payment stream.  Harrison has not offered to reimburse Singer if the Court decided to invalidate the Purchase Agreements.  Allowing Harrison to retain the benefit of the bargain by keeping the lump sum payments while permitting her to receive the very payments she sold in exchange for the lump sum payments would be unjust.  Cf. Mincks Agri Ctr., Inc., 611 N.W.2d at 278 (little forfeiture when the record suggested nothing occurred by way of preparation, performance, or incurring costs related to performance of the contracts at issue).

37

Third, there is no particularly public interest in enforcing the Purchase Agreements.  The Purchase Agreements are private contracts between an individual and a company involving the assignment of monies available as a result of a settlement agreement reached over two decades ago between private parties residing in a different state.

Turning to the factors in favor of invalidating the Purchase Agreements, while the Iowa Structured Settlement Protection Act sets forth provisions applicable to <u>regulate</u> the execution of contracts like the Purchase Agreements, the Act does not <u>prohibit</u> such contracts.  The Act is designed to guarantee payees are fully informed of the ramifications of entering into such con-tracts, <u>see</u> Iowa Code § 682.4(1)(a)-(b), and the record shows Harrison was aware of the impact the Purchase Agreements would have on her payments.  As a result, while the Iowa Structured Settlement Protection Act is a public policy against contracts like the Purchase Agreements, it cannot be said that the Purchase Agreements should be invalidated simply because of the Act's existence.  <u>See</u> Restatement (Second) of Contracts § 178 cmt. *c* ("Even when the policy is one manifested by legislation, it may be too insubstantial to outweigh the interest in the enforcement of the term in question.").  Further, the Act takes a neutral stance on the transfer of settlement agreement payment rights occurring before July 1, 2001.  <u>See</u> Iowa Code § 682.7(5) (providing that the Act "shall not be construed . . . to imply that any transfer under a transfer agreement entered into prior to July 1, 2001, is valid or invalid").  The assignment of Harrison's payments is a transaction of that type.

Second, the likelihood that the policy encapsulated in the Act will be furthered by refusing to enforce the Purchase Agreements is small, primarily because the Purchase Agree-ments were executed before the passage of the Iowa Structured Settlement Protection Act.  Further, this is not a case where the party seeking to enforce the contracts engaged in activity

with criminal implications.  See Bergantzel, 619 N.W.2d at 318; Mincks Agri Ctr., Inc. 611 N.W.2d at 276-77, 269.  Finally, if the Act is designed to protect payees of settlement monies from sinking into financial distress, invalidating the Purchase Agreements would not serve that goal, either, because Harrison would likely be required to return the lump sum payments she received.  If her financial situation is dire now, forcing her to return the those sums would not improve her situation.

The third and fourth factors – the seriousness and deliberateness of any misconduct coupled with the directness of the connection between any misconduct and the terms in question – have little relevance because Harrison has not pointed to evidence suggesting any misconduct occurred during negotiation or execution of the Purchase Agreements.  While Harrison alludes to fraudulent conduct on the part of Singer, she points to nothing in the record to support her claim.  Compare Gilbert, 2006 WL 1211161, at *6 (classifying efforts of a party in Singer's shoes as fraudulent because of the known existence of a provision in the  settlement agreement making "the right to the receipt of periodic payments . . . non-transferrable").[19]

This Court recognizes fully the potential for abuse where structured settlement payees are encouraged to make poor long-term financial judgments in return for short-term lump sum payments, and that this very abuse is the target of the Structured Settlement Protection Act.  However, viewing this record favorably to Harrison, the Court concludes nearly all of the guide-posts used to analyze whether a contract should be invalidated on public policy grounds point in favor of preserving the terms of the Purchase Agreements.  In fact, the only factor pointing in

---

[19] Other cases highlighted by Harrison aid her little.  Grieve is discussed and distinguished above.  In Henderson v. Roadway Express, 720 N.E.2d 1108, 1110-11 (Ill. App. Ct. 1999), the settlement agreement specifically forbade the payee from assigning payments made under the settlement agreement.  The distributorship agreement in Cordis Corp. v. Sonics International, Inc., 427 So. 2d 782, 782-83 (Fla. App. Ct. 1983), prohibited the assignment of a party's "rights" under the agreement, but did not preclude assigning an accrued claim for damages arising from the agreement's breach.  The situation here does not involve the assignment of an accrued claim, it involves the assignment of payments to which a payee was entitled by virtue of a contract which lacked an anti-assignment clause.

favor of invalidation is based on a statute not in existence when the Purchase Agreements were executed and which statute expressly directs against such retroactive impact. As a result, Harrison's Motion for Summary Judgment, insofar as it seeks invalidation of the Purchase Agreements on public policy grounds, must be denied.

### III.    Disposition.

The parties' Motions to Strike (Clerk's Nos. 49 and 59) must be **denied**. Rather, the Court has addressed the concerns expressed in those motions in assigning the weight given the proffered evidence.

With respect to the parties' Motions for Summary Judgment, the Court reaches two legal conclusions. First, the Court concludes neither the Settlement Agreement, the Restructured Annuity, nor Nevada law prevented Harrison from assigning portions of the payment stream created by the Settlement Agreement. Second, the Court concludes Harrison has not generated a fact question regarding whether the Purchase Agreements are violative of an Iowa public policy. Because Harrison relies on no other ground to invalidate the Purchase Agreements, the Court concludes they are valid contracts. As a result, the Court concludes Harrison's Motion for Summary Judgment (Clerk's No. 46) must be **denied**. Because the above discussion views the record favorably to Harrison, Singer's Cross-Motion for Summary Judgment (Clerk's No. 57) must be **granted**.

A number of details remain in the wake of the above decision that have not been fully addressed in the proceedings to date: (1) the specific distribution of the stake, including fees and expenses claimed by Aurora and Singer; (2) the specific handling of payments going forward; (3) the need for injunctive relief; and (4) the need for any additional briefing and hearings. These matters may be resolved by the parties without the need for further court proceedings or may require in part or in whole further arguments and court determinations. Accordingly, the parties are directed to confer and arrange for a Status Conference before United States Magistrate Judge

Celeste Bremer within thirty days of the date of this order, in order to determine the best method for resolving remaining issues and to schedule any further proceedings.

The Final Pretrial Conference and the December 11, 2006, trial date are hereby continued until further order of the Court

**IT IS SO ORDERED.**

Dated this 21st day of November, 2006.

JAMES E. GRITZNER, JUDGE
UNITED STATES DISTRICT COURT